Davis-C v. State 






AFFIRMED
MAY 31, 1990

NO. 10-89-053-CR
Trial Court
# 88-961-C
IN THE
COURT OF APPEALS
FOR THE
TENTH DISTRICT OF TEXAS
AT WACO

* * * * * * * * * * * * *

CHERYL DAVIS,
   Appellant
v.

THE STATE OF TEXAS,
   Appellee

* * * * * * * * * * * * *

 From 54th Judicial District Court
McLennan County, Texas

* * * * * * * * * * * * *

O P I N I O N

* * * * * * *
In this case the Appellant Cheryl Davis was charged by
indictment with the felony offense of Aggravated Possession of a
Controlled Substance, to-wit, amphetamine. Appellant pleaded not
guilty. Trial was had to a jury which found Appellant guilty and
assessed her punishment at twelve (12) years in the Texas
Department of Corrections.
Appellant comes to this court on three points of error.
Points one and two have been discussed together by the
Appellant and the State and are as follows:
First Point: There is insufficient evidence to find that
Appellant exercised actual care, custody, control or management
over the alleged substance because an independent link was not made
between the Appellant and the amphetamine.
Second Point: There is insufficient evidence to find that
Appellant was aware of the presence of the alleged substance
because an independent link was not made between Appellant and the
amphetamine.
On October 7, 1988, the date of the offense in question,
Federal and State drug enforcement officers executed a Federal
search warrant at the rural home of David Mangrum near the City of
West, Texas, in McLennan County. As the officers arrived at said
residence to be searched, they jumped out of their vehicles,
stepped up to the porch and entered the house yelling several
times, "Police officers, we have a search warrant."
D.P.S. Narcotics Officer Robert Wilkerson entered the house
first, with Officer Kent Radney following immediately behind him. 
Wilkerson continued to announce that he was a police officer
executing a warrant, and moved towards the bedroom of the house. 
David Mangrum was seated on the bed in that bedroom with his legs
crossed pointing a gun directly at Wilkerson. A woman, same being
the Appellant, also sat on the bed next to Mangrum. As Wilkerson
came through the French doors which opened into the bedroom,
Mangrum shot and wounded him, Wilkerson, in the right arm;
whereupon Wilkerson reeled into the kitchen while Mangrum kept his
aim focused upon the said officer. Officer Radney and the other
officers returned Mangrum's fire, which resulted in Mangrum being
killed and the Appellant being wounded.
In the bedroom immediately prior to the shooting, Mangrum sat
on the edge of the bed with his legs crossed. The Appellant Cheryl
Davis sat next to Mangrum on his left side. Their shoulders almost
touched, although Appellant was slightly back on the bed. When the
shooting began, Officer Radney saw Appellant on her knees on the
bed wielding a long gun, while Appellant's back was towards the
officer. The stock of the gun protruded from her right side behind
her body. Appellant began to turn around towards officers Bennett,
Radney and Herbert, and pointed the gun in their direction.
After the shooting ended, Appellant was found lying face down
over her shotgun; however, she was still moving. Officer Baier
attempted to take the shotgun out from under Appellant, and she
resisted him, causing him to have to jerk the shotgun out from
under her.
At the foot of the bed where Mangrum and Appellant were
located, there was a coffee table on which lay a box containing
numerous syringes, a Q-tip, and an amber vial. These things were
within an arm's length or less from where Mangrum and Appellant
were sitting at the time of the shooting. The syringe inside the
box was loaded with .16 grams of methamphetamine.
Methamphetamine in powder form was one of the substances found
in a canister containing amphetamine. Powdered methamphetamine is
customarily dissolved in water to liquify the drug for use in a
syringe. Upon the coffee table was also found a metal spoon
containing residue which smelled of methamphetamine or amphetamine.
On the bed where Appellant was found sat a round tin canister
containing four packets of contraband, same being 34.87 grams of
amphetamine and 4.63 grams of methamphetamine. The canister had a
bullet hole through it, although testimony showed that the hole was
an old one because the tightly packed contents were not damaged by
any bullet. Said contents had the distinctive odor of amphetamine
and methamphetamine.
On the same bed where Appellant and Mangrum were sitting was
a small cardboard box containing marihuana together with zig-zag
rolling papers. In Mangrum's pocket was a tin canister containing
another 1.29 grams of amphetamine. Moreover, a small white pill
bottle filled with pills was seized from Mangrum's pocket, same
being hydromorphone, a controlled substance, together with 9.15
grams of diazapan.
Also on the same coffee table lay a pair of binoculars. Near
the bed was a telescope. Testimony was to the effect that persons
involved in illegal drug operations commonly used binoculars and
telescopes for counter-surveillance on police officers. 
Additionally, there were lookout posts set up with two chairs and
a mattress positioned at the windows in the attic of the house. 
Moreover, there was a Bearcat 220 Police Scanner found in the
storage room, and a radio call guide (a published list of
frequencies used by law enforcement agencies) lay on the dresser in
the bedroom. Testimony was to the effect that this call guide may
be used together with the Bearcat scanner in order to overhear law
enforcement radio transmissions. In this call guide book, the
specific frequency for the City of West was circled and underlined.
Also in the bedroom where Appellant and Mangrum were located,
a glass bong was found on the night stand near the bed. A glass
bong such as this is commonly used to smoke marihuana or hash. 
Also on the night stand was a small plastic packet containing
marihuana seeds. On the shelves above the bed were stereo
equipment and a metal smoking pipe, the latter being commonly used
to smoke marihuana or hashish. The residue in this pipe smelled of
marihuana. On the floor between the bed and dresser was found a
blue zipper bag with a set of scales commonly used to measure
drugs.
Various narcotics paraphernalia was found throughout the
house. Ohaus triple-beam scales sat on a kitchen pantry shelf. 
Such scales enable precise measurement of anywhere from half a gram
to several pounds of a controlled substance. Next to these scales,
a glass tube cylinder with milliliters delineated was found; a
clear liquid inside the tube bore the odor of phenol acetone, a
chemical associated with the manufacture of amphetamine and
methamphetamine. Also found in a storage room was a set of
universal scales which are commonly used to enable a person to
measure out larger quantities of amphetamine and methamphetamine,
which scales are commonly found by officers when drug labs are
raided.
On the bed where Mangrum and Appellant were sitting were three
pistols, same being a 9 millimeter, a .44-revolver, and a .22-revolver.
The evidence strongly suggested that Appellant was at least
"shacking up" at Mangrum's house at the time the raid occurred. As
stated, she was found on the bed with Mangrum in the master
bedroom. Both male and female clothing were present inside the
house at the time of the raid. Although Appellant had numerous
personal belongings in her father's house in Waco, Appellant's
father testified that Appellant came and went as she pleased, and
he had not seen Appellant for two to four days prior to the raid. 
Testimony showed that Appellant had actually lived with Mangrum in
this house for a time some months prior to this raid. In a barn
located near the house, officers found stuffed inside a purse
various personal papers belonging to Appellant. 
Appellant's injuries from the shooting caused her to be taken
to Hillcrest Hospital in Waco where blood samples were taken from
Appellant which revealed that her blood contained 0.10 milligrams
per liter of amphetamine. Expert testimony showed that this
concentration of amphetamine found in Appellant's blood was higher
than the usual amount prescribed for medical purposes. Even
Appellant's expert witness testified that this level in Appellant's
blood would be considered a toxic level by his own laboratory. 
Evidence was to the effect that Appellant could have ingested the
drug an hour before the blood sample was drawn. Further, had the
drug been consumed one or two days prior to the blood sample, an
extremely high dosage would be required to achieve the high
concentration found in the blood samples taken. 
The question presented by Appellant's first and second points
of error is whether a rational trier of fact could have found
sufficient facts and circumstances which affirmatively linked the
Appellant to the contraband in question. More specifically, the
rule as announced by our United States Supreme Court in Jackson v.
Virginia (1979), 443 U.S. 307, 319; 99 S.Ct. 2781, 2789; 61 L.Ed.2d
560, is as follows: Whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt. Also, see Dickey v. State (Tex.Cr.App. 1984) 693
S.W.2d 386, and the cases cited therein on page 387.
Our Court of Criminal Appeals in Rhyne v. State (Tex.Cr.App.
1981) 620 S.W.2d 599, 601, and in Woods v. State (Tex.Cr.App. 1976)
533 S.W.2d 16, 18, has set out the rules which apply to the first
two points of error in the case at bar: In order to establish the
unlawful possession of a controlled substance, the State must prove
two elements: (1) that the accused exercised care, control, and
management over the contraband, and (2) that the accused knew the
matter possessed was contraband. It is not necessary to prove that
the accused had exclusive possession of the narcotics in question. 
When the accused is not in exclusive possession of the place where
the substance is found, it cannot be concluded that the accused had
knowledge of and control over the contraband unless there are
additional independent facts and circumstances which affirmatively
link the accused to the contraband.
The issue now presented to us is whether the State established
such independent facts and circumstances to affirmatively link
Appellant to the amphetamine. Viewed in the light most favorable
to the verdict, we believe and hold that the State has established
such independent facts and circumstances as to affirmatively link
the Appellant to the amphetamine.
Both Appellant and Mangrum occupied the bedroom where the
contraband was found. An aggravated amount of amphetamine was
found within a tin container which sat on the bed that both
Appellant and Mangrum occupied. Moreover, the odor of amphetamine
and marihuana in the room emanating from the tin canister and the
smoking apparatus amply pointed out that Appellant not only had
knowledge of the contraband, but also exercised care, custody,
control and management of the contraband. This is strongly
corroborated by the fact Appellant had a high toxic amount of
amphetamine in her blood stream. Appellant had access equal to
Mangrum's to the drugs possessed within the tin canister on the bed
where she sat, as well as to the syringes openly displayed on the
coffee table at the foot of the bed. Also the marihuana on the bed
was also easily accessible to Appellant. In addition to all the
paraphernalia in plain view of Appellant as above pointed out, as
well as the pervasive odor of amphetamine in the room, plus the
toxic amount of amphetamine in Appellant's bloodstream, plus
Appellant's action in going for the gun all affirmatively link
Appellant to the amphetamine in question and, in our opinion,
clearly show that she not only was exercising care, custody,
control and management of the contraband, but also knew full well
that it was contraband. We overrule Appellant's first and second
points of error.
Appellant's third and final point of error is as follows: 
"There is insufficient evidence to support the aggravated portion
of the indictment in that the amphetamine in question was not shown
to be in excess of 28 grams." 
Appellant complains that the evidence is insufficient to
establish an aggravated amount, to-wit, 28 grams of amphetamine,
because the evidence failed to show exactly what else was contained
in the substances which contained amphetamine.
We believe the evidence was ample to prove that Appellant
possessed over 28 grams of amphetamine, including adulterants and
dilutants.
The evidence showed Appellant was found on a bed near a round
tin canister containing four packets of contraband. The container
had in it 34.87 grams of amphetamine and 4.63 grams of
methamphetamine. The three packets which contained amphetamine all
contained a percentage of said controlled substance. More
specifically, their specific weights and percentages of purity
were: (1) 23.74 grams of amphetamine, 21% purity; (2) 6.10 grams
of amphetamine, 57% purity; and (3) 5.03 grams of amphetamine, 22%
purity. The remainder of the bulk of each substance was an
adulterant or a dilutant. We overrule Appellant's third and final
point of error.
Judgment of the trial court is affirmed.
AFFIRMED
 
                          JOHN A. JAMES, JR.
DO NOT PUBLISHJustice (Retired)

[Participating: Chief Justice Thomas, Justices Hall and Means, and
John A. James, Jr., Justice (Retired)]